IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  07-cv-00379-WDM-MJW


CLIFFORD SCOTT FISHER,

Plaintiff,

v.

DR. OBA @ C.C.C.F.,
R.N. LAURA DICKINSON @ C.C.C.F.,
EXECUTIVE WARDEN @ C.C.C.F., and
MRS. BARRONE (CASE MNG. @ C.C.C.F.),

Defendants.

---

**RECOMMENDATIONS ON
PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND
SUPPLEMENTAL COMPLAINT (Docket No. 93)
and
DEFENDANTS OBA, DICKINSON, SMELSER AND BARRONE'S
MOTION FOR SUMMARY JUDGMENT
(Docket No. 65)**

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**


This case is before this court pursuant to an Order of Reference to

Magistrate Judge issued by Judge Walker D. Miller on April 5, 2007.  (Docket No. 8).

Now before the court for a report and recommendation are two dispositive

motions.  The first is the plaintiff's Motion for Leave to File an Amended Complaint and

Supplemental Complaint (Docket No. 93).  Defendants filed a response (Docket No.

96).  The second motion is Defendants Oba, Dickinson, Smelser and Barrone's Motion

for Summary Judgment (Docket No. 65).  Plaintiff filed a response (Docket No. 68), and

defendants filed a reply (Docket Nos. 78).  Plaintiff then filed what is in essence a sur-

reply (Docket No. 79).  Pursuant to this court's order (Docket No. 98), defendants filed

affidavits from Dr. Cary Patt (Docket Nos. 102 and 103).[1]

The court has considered the two motions, the responses thereto, and the reply

and sur-reply concerning the summary judgment motion.  In addition, the court has

considered the court's file and applicable Federal Rules of Civil Procedure and case

law.  The court now being fully informed makes the following findings, conclusions, and

recommendations.

## PLAINTIFF'S ALLEGATIONS

The pro se incarcerated plaintiff asserts the following in his Prisoner Complaint

(Docket No. 4) brought pursuant to 42 U.S.C. § 1983.  Plaintiff commenced his

sentence in July 2006 when he checked into the Denver Reception and Diagnostic Unit

("DRDC").  DRDC medical personnel were aware of plaintiff's "serious, and

deteriorating, medical issue," namely, polyps, which plaintiff states "are the beginning

phases of cancer, which is lethal.  There currently is NO cure for Colon Cancer, and

knowing this continually produces immense psychological torment on me and my

family."  (Docket No. 4 at 4).  The Colorado Department of Corrections had plaintiff's

medical papers and was aware of plaintiff's appointment for a final colonoscopy on

---

[1]In support of their motion for summary judgment, defendants relied on, among
other documents, memoranda purportedly containing the expert opinion of Dr. Patt, but
those memoranda were unsworn, unverified, had not been stated to be true and correct,
and had not been declared under the penalty of perjury.  Therefore, this court directed
that such memoranda would be stricken unless defendants filed authenticating affidavits
from Dr. Patt within ten days.  (Docket No. 98).

August 11, 2006, yet plaintiff's many attempts to obtain the recommended treatment have been unsuccessful.  He has been medically evaluated,  the diagnosis has been polyps-related, and recommendations have been put into his file for "initiation and maintenance," which have not been done.  After plaintiff filed grievances, he was taken to the medical department, put through some "basic analyzing," and assured he is fine and that paperwork was in the process of being approved.  He has been told he needs to remain patient until approval is granted for further treatment.

Plaintiff raises three claims for relief.  First, he asserts that his "rights pursuant to the 6th Amendment have been violated" because "[i]n accordance with my Sixth Amendment Rights, I do possess the right -as a convicted felon - to receive medical treatment, and due process of law, which I am initiating herein."  (Docket No. 4 at 6). He contends that his Sixth Amendment rights have been violated as a result of medical personnel not properly administering the recommendations by the medical professionals.

Next, in Claim Two, plaintiff asserts that his Eighth Amendment rights are being violated, claiming the failure to comply with the medical professionals' recommendation constitutes cruel and unusual punishment.  More specifically, he asserts the following. Defendant Laura Dickinson, RN, at Crowley County Correctional Facility ("CCCF"), failed to set plaintiff's appointments and consult with the appropriate officials in order to get plaintiff's medical expenses approved.  Defendant case manager Mrs. Barrone, at CCCF, repeatedly failed to help plaintiff receive his treatment despite plaintiff's grievances and his personal attempts to get her to contact various officials to obtain approval for the treatment.  Defendant Dr. Oba "was very helpful, and will be a key

witness in substantiating my claims and/or recommendations."  (Docket No. 4 at 7).

In his third claim, plaintiff alleges that his "Rights under the Diliberate [sic] Indifference Clause to the United States Constitution have been violated."  (Docket No. 4 at 8).  He claims that medical personnel are incompetent to handle cases such as his, which "violates the Deliberate Indifference Clause to the United States Constitution." (Docket No. 4 at 8).  He alleges the defendant Executive Warden is liable for the medical personnel at the facility, and it is that person's responsibility to ensure that such personnel are properly trained and that inmates are receiving medical care.  Plaintiff alleges that "[t]he primary reason for the delay in my case is due to finances, as their [sic] currently exists medical expenses to be approved before I can begin receiving some of my major treatment . . . ."  (Docket No. 4 at 8).

As relief, plaintiff asks that his medical expenses be approved and that the medical treatment recommendations be initiated "at once."  Due to alleged possible permanent damage to his internal organs which allegedly are the result of the delayed treatment, plaintiff is also seeking "Five Million Dollars in Actual Damages, as my life is priceless.  -Five Million Dollars in punitive/exemplary damages for mental torment and physical abuse/colon cancer repurcussions [sic].  -Five Million Dollars in nominal damages."  (Docket No. 4 at 10).  Finally, he seeks an investigation into the medical practices and competency levels at DRDC and CCCF.

**PLAINTIFF'S MOTION TO AMEND AND SUPPLEMENT THE COMPLAINT**

In his motion to amend and supplement the Complaint (Docket No. 93), filed on September 2, 2008, plaintiff seeks to "add[] more people and more rights violation from [CCCF] Medical Department and other departments as well."  (Docket No. 93). Plaintiff

seeks to add the following nine new defendants: RN Mathew Stevens, Dr. Lois Cabling, LPN Rebecca Long, RN P. Walter, RN Jeremy, RN Jamie, Medical Scheduler Judie Brizendine, RN B. Shaun (or Staun), and Victor Garcia.

Plaintiff contends in his proposed amended complaint that since the filing of the original Complaint, he has experienced more medical problems and has begged and pleaded the medical department and even defense counsel for help with those problems to no avail. Defense counsel purportedly told plaintiff that the new medical issues are not related to the current colon issues. Plaintiff eventually convinced defense counsel to call CCCF's Medical Department and tell them to treat him. Plaintiff was called down to the Medical Department, and Dr. Cabling simply laughed at plaintiff, told him it was not his problem, and "why don't you sue the Dr.'s we sent you to instead of us."

Plaintiff alleges the following additional medical complaints: kidney pain for over a year, unexplained lumps on his body, a mass on the right testicle, prostate trouble, and a needed colonoscopy. With regard to the lumps, plaintiff asked for a second opinion from an outside doctor, and plaintiff was told he is not entitled to one unless he paid for it himself, which plaintiff is unable to do. Plaintiff contends that the lumps could very well be cancerous due to malignant cancer history in his family and that the lumps need to be removed and biopsied. With regard to his right testicle, plaintiff states that St. Mary's Corwin performed an ultrasound, and the findings stated that plaintiff needs another ultrasound, but defendants have failed to provide that second ultrasound. Plaintiff contends that the worst possible outcome is testicular cancer. Regarding his prostate trouble, plaintiff asserts that while he was being diagnosed at the state hospital,

Dr. Werner checked plaintiff's prostate and prescribed some medication that plaintiff took to no avail. Plaintiff has asked the nurses and doctor for help, but the issue has not been resolved, nor has any attempt been made to help plaintiff with his prostate trouble. Finally, plaintiff asserts that due to the numerous polyps, and their size, that have been discovered via colonoscopies, he needs another colonoscopy before the recommended three years.

Plaintiff once again seeks $5 million in actual damages and $5 million in punitive/exemplary damages.

In response, defendants assert that the plaintiff's request to amend his complaint should be denied as untimely. They note that plaintiff's request to amend was filed well past the deadline of July 13, 2008, established in the Scheduling Order and the Courtroom Minutes (Docket Nos. 66 and 67), and they assert plaintiff has failed to present good cause for extending the deadline for amendment by more than fifty days. Defendants further note that plaintiff contends that he attempted to file an amended complaint in November 2007, yet it was lost in the prison mail. In support of that position, plaintiff attached a copy of a memorandum from Nichelle Valdez dated April 10, 2008, detailing mail processing issues in existence during December 2007 and January 2008. Defendants assert, however, that notwithstanding plaintiff's position that he attempted to timely file an amended complaint, something defendants note cannot be confirmed or denied, plaintiff appeared before this court on May 7, 2008, for a Scheduling Conference and was advised at that time that no amended complaint had been filed and that he had until July 13, 2008, to file a motion to amend his complaint. Nevertheless, plaintiff did not file his motion to amend or supplement his complaint until

September 2, 2008, over fifty days past the July 13 deadline set by the court.

Defendants further assert that an additional reason plaintiff's request to amend is untimely is that the facts serving the basis for seeking leave to amend were known to the plaintiff from the inception of this case, and certainly prior to the July 13 deadline. Defendants note that in his response to their motion for summary judgment filed on May 8, 2008, plaintiff argued that the delay in obtaining his colonoscopy caused current and lasting medical issues including kidney pain, unexplained lumps on his body, testicle lump, and problems with his prostate.

In addition, defendants assert that allowing plaintiff to amend his complaint at this late stage will also delay administration of this case and prejudice defendants. They note that plaintiff's proposed addition of new parties comes less than two months before the discovery cutoff period and almost four months after the scheduling conference. Defendants contend that adding these new parties at this late stage of the proceedings would inevitably delay the case, noting that if added, service must be accomplished, and the parties would need an opportunity to conduct discovery. Defendants assert that such an undertaking would require the entry of another scheduling order allowing the new defendants sufficient time to conduct discovery. Defendants further argue that they would also be prejudiced by the amendment as they would need to send additional written discovery and depose plaintiff a second time, obtain new expert reports based on the new allegations, and withdraw and resubmit defendants' motion for summary judgment.

Finally, defendants further argue that plaintiff's proposed amendment must be denied as futile because it fails to state a cognizable cause of action.

Defendants correctly assert that the plaintiff's motion was made after the deadline for amendment of pleadings. Therefore, this court has applied the following analysis in deciding whether to allow the amendments:

> Where, as here, a motion to amend the pleadings . . . is filed after the scheduling order deadline, a "two-step analysis" is required. Once a scheduling order's deadline for amendment has passed, a movant must first demonstrate to the court that it has "good cause" for seeking modification of the scheduling deadline under Rule 16(b). If the movant satisfies Rule 16(b)'s "good cause" standard, it must then pass the requirements for amendment under Rule 15(a) . . . .
>
> Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that the scheduling deadlines cannot be met despite a party's diligent efforts. In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension." Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.

Pumpco, Inc. v. Schenker Int'l, Inc., 204 F.R.D. 667, 668 (D. Colo. 2001) (quotations and citations omitted). The second step is consideration of whether the plaintiff has satisfied the standard for amendment of pleadings required under Fed. R. Civ. P. 15(a):

> Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.

Id. at 669 (citation omitted). Based upon this standard, and substantially for the reasons stated in the defendants' response, this court recommends that the proposed amendments and supplements should not be permitted. Plaintiff has not established any cause, let alone good cause, for modifying the Scheduling Order

deadline.  While plaintiff may have had problems with his mail delivery back in December 2007 and January 2008, as noted by defendants, plaintiff was told at the Scheduling Conference in May 2008 that the court had not received plaintiff's motion to amend, and plaintiff was given a July 13 deadline for seeking any amendments and supplements to the Complaint.  Plaintiff has not shown any cause why he waited until September to file his motion with the court, and it is evident, as shown by defendants, that plaintiff was aware of his proposed amendments and supplements prior to the deadline set in the Scheduling Order.  Therefore, it is recommended that the plaintiff's motion to amend or supplement be denied.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Oba, Dickinson, Smelser, and Barrone move for summary judgment pursuant to Fed. R. Civ. P. 56.  Rule 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial." Robertson v. Board of County Comm'rs of the County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mares v. ConAgra Poultry Co., 971 F.2d 492, 494 (10th Cir. 1992)).  "Once a properly supported summary judgment motion is made, the opposing party may not rest on the

allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. . . .  These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings by themselves.'" <u>Southway v. Central Bank of Nigeria</u>, 149 F. Supp.2d 1268, 1273 (D. Colo. 2001), <u>aff'd</u>, 328 F.3d 1267 (10th Cir. 2003).  However, "[i]n order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*. . . .  The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but '"the content or substance of the evidence must be admissible."' . . .  Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill."'" <u>Adams v. American Guarantee & Liability Ins. Co.</u>, 233 F.3d 1242, 1246 (10th Cir. 2000).  <u>See</u> <u>Wright-Simmons v. City of Oklahoma City</u>, 155 F.3d 1264, 1268 (10th Cir. 1998).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." <u>Southway</u>, 149 F. Supp.2d at 1273.  "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . .  Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist." <u>Id.</u>; <u>Robertson</u>, 78 F. Supp.2d at 1146 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); quoting <u>White v. York Int'l Corp.</u>, 45 F.3d 357, 360 (10th Cir. 1995)).

"Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment."  <u>Southway</u>, 149 F. Supp.2d at 1274.  "Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party."  <u>Id.</u> at 1273.

Since the plaintiff is not an attorney, his pleadings have been construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.  <u>See</u> <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972)).  Therefore, "if the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. . . .  At the same time, . . . it is [not] the proper function of the district court to assume the role of advocate for the pro se litigant."  <u>Id.</u>

In this case, in their motion for summary judgment, the defendants recite a short statement of alleged undisputed facts as follows.  Plaintiff is an inmate incarcerated by the CDOC.  He was first diagnosed with polyps on May 26, 2006.  A colonoscopy was recommended by Dr. Murchison and scheduled for August 2006.  The month before, however, in July 2006, plaintiff's community corrections sentence was revoked, and he was resentenced to the custody of the CDOC.  On September 22, 2006, plaintiff contacted his case manager, defendant Barrone, claiming that he was bleeding from his colon, and the Medical Department at CCCF was not helping him.  Barrone contacted the Medical Department and was told by a nurse that plaintiff had been in Medical on a

sick call for his tooth on September 19 or 20 and never told anyone that he was bleeding from his rectum.  Plaintiff was seen that day (September 22, 2006) by defendant Dr. David Oba, who put in a referral for plaintiff to have a colonoscopy.  On March 23, 2007, plaintiff was seen by Dr. Louis Cabiling to discuss the colonoscopy referral.  Dr. Cabiling checked the pending consult, and the colonoscopy was approved. The colonoscopy was performed on plaintiff on April 24, 2007, at Pueblo Endoscopy Suites, where polyps were removed from plaintiff's descending colon, sigmoid colon, and rectum.  On June 19, 2007, plaintiff was seen by Dr. Cabiling for a follow-up visit, and plaintiff was scheduled for a follow-up colonscopy.  Plaintiff next had a follow-up visit with Dr. Cabiling on September 18, 2007.  Plaintiff's x-rays were negative, and the referral for the follow-up colonoscopy was approved.  That colonoscopy was performed on plaintiff on December 4, 2007, at the Pueblo Endoscopy Suites.  (Docket No. 65 at 2-3).

Defendants make the following arguments in support of their motion for summary judgment: (1) plaintiff's claim for injunctive relief is moot; (2) plaintiff fails to support any constitutional rights violation claims against the defendants; and (3) plaintiff was not harmed by any delay in his treatment.

**Mootness**

Defendants first assert that plaintiff's claim for injunctive relief is moot.  They assert that the Complaint as a whole makes clear that the treatment sought by plaintiff is the colonoscopy recommended by Dr. Murchison.  As plaintiff's medical records show, colonscopies were performed on the plaintiff on April 24, 2007, and December 4, 2007.  Therefore, since plaintiff has now received the treatment for his polyps which he

sought in his Complaint, defendants assert that plaintiff's claim for injunctive relief is rendered moot.

In response, citing his proposed amended complaint, plaintiff asserts that his claim for injunctive relief is not moot since he is still in need of more help concerning his medical conditions. (Docket No. 68 at 1-2).

The court recommends dismissal of plaintiff's claim for injunctive relief not only because the requested colonoscopies were performed, but also because the plaintiff has been released. According to a letter from plaintiff to the court, as of October 30, 2008, his address is at his mother's house in Craig, Colorado. (Docket No. 106). See McAlpine v. Thompson, 187 F.3d 1213, 1215 (10th Cir. 1999) ("[W]hen an inmate's claim for prospective injunctive relief regarding conditions of confinement becomes moot due to the inmate-plaintiff's release from confinement, the inmate's parole or supervised release status does not, absent some exceptional showing, bring that claim under the narrow 'capable of repetition, yet evading review' exception to the mootness doctrine.").

**Medical Claim**

Defendants next assert that plaintiff fails to support any constitutional rights violation claims against them. Although plaintiff tries to assert claims under not only the Eighth Amendment but the Sixth Amendment, it appears that plaintiff is essentially raising a deliberate indifference claim under the Eighth Amendment. "[P]risoners have an Eighth Amendment right to adequate medical care . . . ." Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001). "In keeping with the principle that government officials are generally afforded wide latitude when fulfilling their discretionary functions, . . .

however, in cases where prisoners allege that inadequate or delayed medical care violated their Eighth Amendment rights, it has been established that '[p]rison officials violate the Eighth Amendment [only] when they are deliberately indifferent to the serious medical needs of prisoners in their custody.'" Id.

"To establish deliberate indifference, a prisoner must demonstrate more than mere negligence; a negligent failure to provide adequate medical care, even one constituting medical malpractice, does not rise to the level of a constitutional violation." Alejo v. Gonzalez, 2000 WL 64317, *1 (10th Cir. Jan. 26, 2000). See Estelle v. Gamble, 429 U.S. 97, 105-06 (1976) (A complaint "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); Glick v. Romer, 2000 WL 328127 (10th Cir. Mar. 29, 2000). Rather, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. at 106. "The test for constitutional liability of prison officials 'involves both an objective and a subjective component.'" Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). As the Tenth Circuit has explained:

> to properly set forth an Eighth Amendment claim on which relief may be granted, [the prisoner] must set forth facts demonstrating [1] that his alleged medical need . . . was sufficiently serious to meet the objective element of the deliberate indifference test, and [2] that the Defendants' delay in meeting that need caused him substantial harm. . . . Finally, to meet the subjective element of the deliberate indifference test, [the prisoner] must allege facts supporting an inference [3] that Defendants knew about and disregarded a substantial risk of harm to his health or safety.

Oxendine v. Kaplan, 241 F.3d at 1276-77 (quotations omitted).

**Delayed Colonoscopy.** In this case, plaintiff complains about the delay in his

receipt of a recommended colonoscopy that he had scheduled but did not occur

because he ended up in CDOC custody. "[A] delay in medical care only constitutes an

Eighth Amendment violation where the plaintiff can show the delay resulted in

substantial harm." Mata v. Saiz, 427 F.3d at 751. Here, this court finds that the

defendants have established that there is no genuine issue of material fact that the

delay here did not result in any such substantial harm. Defendants' expert, Dr. Cary

Patt, a board certified gastroenterologist, who reviewed plaintiff's medical records,

states in her affidavit:

> I do not feel that any harm resulted from the delay in coloscopy from the flexible sigmoidoscopy in May 2006 to the colonoscopy in April 2007 and a second December 2007.

> I believe harm would have resulted if delay in colonoscopy had led to the following things:

> 1.  If further growth of the polyps resulted in the inability to remove them endoscopically, therefore requiring surgery.

> 2.  If further growth of the polyps resulted in high grade dysplasia (the final stage before malignancy) or carcinoma, as this would have future prognostic implications.

> 3.  If further growth resulted in the inability to completely remove the polyps necessitating a staged procedure (i.e. removal of a portion on serial colonscopies).

> None of the above occurred. Initial endoscopy successfully removed the polyps which were tubular adenomas (benign polyps without aggressive features or dysplasia).

> Mr. Fisher was able to have all of his polyps removed successfully. The large rectal polyp was able to be removed in one session. The second colonoscopy revealed only one small tubular adenoma at the splenic flexure and hyperplasia in the rectum and sigmoid (hyperplasia does not lead to cancer and is unrelated to the original large polyps seen).

> The delay in colonoscopy did not result in the formation of new polyps, as

this procedure does not prevent growth of new polyps, only continued growth of existing ones.

His current condition is that on someone with a history of multiple polyps and therefore the recommended screening interval of three years is appropriate. This would not have been altered with a more expedient colonoscopy. In my opinion, the delay has not caused any current or lasting medical issues.

(Docket No. 102). In his response to the motion, plaintiff expressed his disagreement with Dr. Patt's opinions, arguing that the "pictures and diagrams prove otherwise," that "there is no way to tell if the Plaintiff had high-grade dysplasia because not all of the polyps removed were tested," that "[t]he delay of the colonoscopy did result in further growth of polyps in the colon, and that he has had "numerous complications post-surgery" (i.e., "kidney pain, unexplained lumps on his body, testicle lump and problems with his prostate"). "Plaintiff also disagrees with the 3-year delay of a follow-up colonoscopy, due to the factual findings of the last colonoscopy." (Docket No. 68 at 4-5).

In a Supplemental Affidavit, Dr. Patt answered defense counsel's questions that were apparently raised as a result of plaintiff's layman interpretation and disagreement with Dr. Patt's opinions, as follows:

1. Q: Is it standard practice for only a portion of the polyps removed after a colonoscopy to be tested? Mr. Fisher has expressed his concern that there is no way to tell if he has high-grade dysplasia because not all of the polyps removed during the procedures were tested.

A: It is standard practice to remove all polyps at colonoscopy unless there is a large worrisome polyp. If this is the case on occasion the endoscopist will take biopsies to see if it is more appropriate to be treated with surgery rather than endoscopic resection. In addition some polyps are not able to be removed for technical reasons any may be referred to surgery. In this case it was a flexible sigmoidoscopy performed prior to his incarceration and not a colonoscopy in which the rectal polyp was left in. This is within the standard of care to differ removal of large polyps until colonoscopy when the entire colon can be studied.

During his colonoscopies all polyps were removed and tested.

2.  Q: Your initial report states "the second colonoscopy revealed only one small tubular adenomas at the splenic flexure and hyperplasia in the rectum and sigmoid (hyperplasia does not lead to cancer and is unrelated to the original large rectal polyp seen)." Mr. Fisher has interpreted this sentence to mean only one polyp was found during the second colonoscopy.  Can you clarify your finding above?

A:  Hyperplastic polyps are polyps, therefore more than one was removed. They are different on pathology and in terms of prognosis, but are polyps.  I stated in my first letter "The second colonoscopy revealed only one small tubular adenoma at the splenic flexure and hyperplasia in the rectum and sigmoid (hyperplasia does not lead to cancer and is unrelated to the original large rectal polyp seen)."  This means that all of these polyps (tubular adnomas which can be precancerous and hyperplastic polyps or hyperplasia which are not precancerous) were removed and tested.

3.  Q: Your report states that harm would have resulted if the growth of the polyps resulted in the inability to remove them edoscopically, therefore requiring surgery.  Mr. Fisher states a polypectomy is surgical. Can you elaborate on your statement?

A:  Polypectomy is an endoscopic procedure and not a surgical procedure. It does not require abdominal incision, general anesthesia or a surgeon to perform.

4.  Q: Your report states harm would have resulted if further growth resulted in the inability to completely remove the polyps necessitating a staged procedure (i.e. removal of a portion on serial colonoscopies). According to Mr. Fisher, findings from the second colonoscopy revealed serial colonoscopies.  Please explain?

A:  The second colonscopy was to look for additional polyps not to serial remove a known polyp.

5.  Q:  Mr. Fisher states harm did result from his delay in receiving the colonoscopy since he has numerous complications post surgery including kidney pain, unexplained lumps on his body, testicle lump and problems with his prostate.  In your professional opinion and your review of Mr. Fisher's medical records, did any of the medical conditions described above result from the delay in receiving the colonoscopy?

A:  No, I do not believe this to be related.

(Defense counsel's questions - Docket No. 78-2; Dr. Patt's responses - Docket Nos. 78-3, 103).

Plaintiff has not submitted any evidence contrary to Dr. Patt's expert opinions. At best, plaintiff has provided some of the same medical documents submitted by the defendants, which are not contrary to Dr. Patt's opinions, and plaintiff's own layman opinions. The evidence submitted in opposition to a summary judgment motion, however, "must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." <u>Southway</u>, 149 F. Supp.2d at 1274. This court this finds there is no genuine issue of material fact with respect to whether the delay in conducting plaintiff's colonoscopy caused "substantial harm." It is thus recommended that defendants are entitled to judgment as a matter of law on the plaintiff's medical claims.

**<u>Personal Participation.</u>** Alternatively, summary judgment should be granted to several of the defendants based upon their lack of personal participation. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." <u>Foote v. Spiegel</u>, 118 F.3d 1416, 1423 (10th Cir. 1997). With regard to the liability of supervisors:

> Under § 1983, government officials are not vicariously liable for the misconduct of their subordinates. "[T]here is no concept of strict supervisor liability under § 1983." . . . "This does not mean that a supervisor may not be liable for injuries caused by the conduct of one of his subordinates. It does mean that his liability is not vicarious, that is, without fault on his part." . . . .

> Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights. To establish supervisor liability under § 1983, "it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who

actually committed the violation. Instead, . . . the plaintiff must establish 'a deliberate, intentional act by the supervisor to violate constitutional rights.'" . . . In short, the supervisor must be personally "involved in the constitutional violation," and a "sufficient causal connection" must exist between the supervisor and the constitutional violation." . . . .

In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution. Then, a plaintiff must show an "affirmative link" between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates. . . . In this context, the supervisor's state of mind is a critical bridge between the conduct of a subordinate and his own behavior. Because "mere negligence" is not enough to hold a supervisor liable under § 1983, a plaintiff must establish that the supervisor acted knowingly or with "deliberate indifference" that a constitutional violation would occur. . . .

Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1151-52 (10th Cir. 2006) (citations omitted).

Defendants correctly assert that plaintiff does not allege in his Complaint that defendant Smelser, the Warden of CCCF, had any personal participation in the determination of whether to provide plaintiff with the requested treatment for his polyps. The only factual allegations in the Complaint with respect to Smelser are that he "is responsible for ensuring that contracted medical personnel is of a standard that can effeciently [sic] administer and satisfy all inmates fundamental constitutional rights, including the paramount right to receive medical treatment, especially in life or death circumstances" and that he is "liable for the medical personnel at his/her facility. It is his/her responsibility to ensure that his/her medical personnel are trained in all aspects of medical administration, and when he/she falls short of this tantamount requirement, he/she is violating the inmate(s) constitutional rights to medical treatment. . . ." (Docket No. 4 at 8). Furthermore, as correctly asserted by defendants, plaintiff's admissions in

his deposition show that Smelser lacks the personal participation to be liable to plaintiff on his claims here. (See Docket No. 78-3, Defs.' Ex. A-15). Plaintiff admitted Smelser is not a doctor or medical professional, was not present when plaintiff received his medical care, never had a discussion with plaintiff regarding plaintiff's medical care and treatment, and has never spoken with plaintiff on any issue. (Docket No. 78-3, Defs.' Ex. A-15). The reason plaintiff sued Smelser was because "[h]e's in charge of the prison. He's in charge of the inmates. . . . He's in charge of my medical care. . . . He's in charge of the hiring and firing of everybody in medical, and they provide medical care for me. So I would assume that he's in charge of making sure they do their job, which obviously they weren't, in my opinion." (Docket No. 78-3, Defs.' Ex. A-15, Pl.'s Dep. at 102-04). An individual defendant, however, may not be held liable on a theory of respondeat superior merely because of his supervisory position. Sanderson v. City of Aurora, 2008 WL 2037808, *2 (D. Colo. May 9, 2008) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986); McKee v. Heggy, 703 F.2d 479, 483 (10th Cir. 1983)).

In addition, with respect to plaintiff's claim against defendant Barrone, his case manager, defendants correctly assert that plaintiff has failed to establish that Barrone had any ability to impact any medical decision concerning plaintiff's medical treatment. In fact, plaintiff admitted during his deposition that Barrone contacted the medical department on his behalf every time he asked for her assistance. (Docket No. 65-12 at 1; Defs.' Ex. A-11, Pl's Dep. at 106, 108). He stated that "I'm suing Ms. Barron [sic] because she was in - she was responsible for me as an inmate. She was responsible for me to get medical treatment, yes. She was responsible for getting me what I

needed.  She's in charge of me.  She is my case manager.  Bottom line, I didn't get what I needed."  (Docket No. 65-12 at 1; Pl's Dep. at 109).

With regard to defendant nurse Dickinson, plaintiff alleges in the Complaint that she failed to set his appointment and consult with the appropriate officials in order to get plaintiff's medical expenses approved.  Defendants assert that plaintiff has not established that Dickinson had anything to do with the decision concerning whether plaintiff should receive a colonoscopy.  Therefore, Dickinson's alleged lack of personal participation in the actual medical treatment decision purportedly makes it inappropriate to hold her liable to the plaintiff under the Eighth Amendment as a matter of law. Reading plaintiff's Complaint liberally, however, it could be read as alleging that Dickinson was involved in the alleged delay in plaintiff having the prescribed colonoscopy.  Therefore, it is not recommended that summary judgment be granted to this defendant on the ground of lack of personal participation.  Nevertheless, for the reasons stated above, plaintiff has not established the requisite substantial harm as a result of any delay.

Plaintiff, however, fails to state a claim with respect to Dr. Oba, who saw plaintiff on September 22, 2006, when plaintiff was experiencing blood in his stool for several days.  The doctor reviewed and discussed with plaintiff the plaintiff's medical history and concluded that a colonoscopy should be performed.  Dr. Oba requested a referral to a gastroenterologist for the colonoscopy.  (Docket No. 65-13, Defs.' Ex. A-4, A-12). Plaintiff found Dr. Oba "very helpful" and that was the main reason Dr. Oba was named

in this lawsuit.[2]  (Docket No. 65-13; Defs.' Ex. A-12, Pl.'s Dep. at 100).  Plaintiff testified

at his deposition that Dr. Oba "knew more - It seemed he knew more about polyps and

colon cancer and gastro.  He knew a lot about it.  He drew me diagram and everything

about the intestinal walls; the thickness of them, the size of polyps, the shames.  And he

told me more information that the gastro specialist did."  (Defs.' Ex. A-5, Pl.'s Dep. at

40).  Plaintiff simply has not established any deliberate indifference on the part of Dr.

Oba.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that plaintiff's Motion for Leave to File an Amended Complaint

and Supplemental Complaint **(Docket No. 93)** be **denied**.  It is further

**RECOMMENDED** that Defendants Oba, Dickinson, Smelser and Barrone's

Motion for Summary Judgment **(Docket No. 65)** be **granted**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the**

**parties have ten (10) days after service of this recommendation to serve and file**

**written, specific objections to the above recommendation with the District Judge**

**assigned to the case.  The District Judge need not consider frivolous, conclusive,**

**or general objections.  A party's failure to file and serve such written, specific**

**objections waives *de novo* review of the recommendation by the District Judge,**

**Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of**

---

[2]Plaintiff stated, "Dr. Oba was very helpful.  The main reason why I'm naming him
in this lawsuit is for that purpose.  He was very helpful.  I mean, I don't - Shit, I should
have called him - I should call him as -on my side, but not against me, you know.  But
that's neither here nor there."  (Docket No. 65-13; Pl.'s Dep. at 100).

**both factual and legal questions. <u>Makin v. Colorado Dep't of Corrections</u>, 183**

**F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir.**

**1996).**


Date:  December 3, 2008               <u>s/ Michael J. Watanabe      </u>
         Denver, Colorado                Michael J. Watanabe
                                      United States Magistrate Judge